[970 NE2d 856, 947 NYS2d 821]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEO LEONARD, Appellant.

Argued April 25, 2012; decided May 31, 2012

**POINTS OF COUNSEL**

*Stuart M. Cohen*, Rensselaer, for appellant. I. The People failed to prove a kidnapping. (*People v Petre*, 151 Misc 2d 543; *Matter of Bennett v Jeffreys*, 40 NY2d 543; *Offenhartz v Cohen*, 144 Misc 2d 130; *People v McDonald*, 147 Misc 2d 33; *People v Brown*, 264 AD2d 12.) II. The trial court's refusal to rule on defendant's pretrial request for inspection of the grand jury minutes constituted error per se; if not error per se, the error was not harmless. (*People v Wood*, 66 NY2d 374; *People v Jones*, 47 NY2d 409, 444 US 946; *People v Damiano*, 87 NY2d 477; *People v Lawrence*, 64 NY2d 200; *Matter of Veloz v Rothwax*, 65 NY2d 902; *People v Harris*, 82 NY2d 409.) III. The remarks of the prosecutor on summation, to which defense counsel objected, denied defendant a fair trial. (*People v Riback*, 13 NY3d 416; *People v Calabria*, 94 NY2d 519; *People v Ashwal*, 39 NY2d 105.)

*D. Holley Carnright, District Attorney*, Kingston (*Joan Gudesblatt Lamb* and *Shirley Huang* of counsel), for respondent. I. The evidence was legally sufficient to support defendant's conviction of kidnapping in the second degree. (*People v Hawkins*, 11 NY3d 484; *People v Gray*, 86 NY2d 10; *People v Carncross*, 14 NY3d 319; *People v Hines*, 97 NY2d 56; *Matter of Bennett v Jeffreys*, 40 NY2d 543; *Offenhartz v Cohen*, 144 Misc 2d 130; *People v Kearns*, 56 AD3d 1047, 12 NY3d 784; *People v Gary*, 87 AD2d 655; *People v Franklin*, 79 AD2d 611, 52 NY2d 903; *Riley v County of Broome*, 95 NY2d 455.) II. County Court's failure to perform an inspection of the grand jury minutes prior to trial to determine whether the charges were supported by legally sufficient evidence was not per se reversible error, and such failure can be subject to harmless error analysis. (*People v*

*Archie*, 78 AD3d 1560, 16 NY3d 856; *People v Smith*, 13 AD3d 1121, 4 NY3d 803; *People v Sommerville*, 6 AD3d 1232, 3 NY3d 648; *People v Crimmins*, 36 NY2d 230; *People v Patterson*, 39 NY2d 288, 432 US 197; *People v Agramonte*, 87 NY2d 765; *People v Casey*, 95 NY2d 354; *People v Becoats*, 17 NY3d 643; *People v Wood*, 66 NY2d 374; *People v Kelly*, 5 NY3d 116.) III. The remarks of the prosecutor on summation, challenged by the defense, did not deprive defendant of his constitutional right to a fair trial, as the trial court not only sustained most of defendant's objections, but issued prompt curative instructions, sua sponte, which served to alleviate any potential prejudice, and defendant did not object to the instructions as given or request further corrective action. (*People v Medina*, 53 NY2d 951; *People v Heide*, 84 NY2d 943; *People v Davis*, 58 NY2d 1102; *People v Santiago*, 52 NY2d 865; *People v Williams*, 46 NY2d 1070; *People v Alvino*, 71 NY2d 233; *People v Lott*, 55 AD3d 1274, 11 NY3d 898; *People v Tinning*, 142 AD2d 402, 73 NY2d 1022; *People v Galloway*, 54 NY2d 396; *People v Ortiz*, 54 NY2d 288.)

**OPINION OF THE COURT**

SMITH, J.

This case raises the question of whether it is possible for a parent who has custodial rights to a child to be guilty of kidnapping that child. We hold that it is possible, and that it happened here, where defendant used his baby daughter as a hostage, threatening to kill her if the police approached him.

I

Defendant had a romantic relationship with a woman whom we will call Mary, which ended a few days after their daughter was born. Mary then moved with the baby from Brooklyn, where she and defendant had both been living, to Ulster County. There was no court order affecting the custody of the child, so defendant and Mary were equally entitled to custody.

When the baby was six weeks old, defendant paid an unexpected visit to Mary's new home. He and Mary had an argument, in the course of which he abused her verbally, threatened her with a knife, and cut her. He then calmed down and permitted Mary to leave for work, while the baby remained with him. Mary called her mother and a friend from her car, and the friend called the police.

Some time later, Mary's mother and stepfather came to Mary's home and found defendant outside the house, holding

the baby. Shortly after that, Mary, her employer and several police officers arrived on the scene. At the sight of the police, defendant took out a knife and gestured toward the baby with it; still holding the baby, he retreated into the house. There followed a lengthy discussion in a bedroom between defendant and the police officers, during which defendant held the knife near the child's chest and throat, and told the officers that if they came closer he would kill the child. He was finally persuaded to give the baby, unharmed, to the police.

Defendant was convicted of kidnapping in the second degree, as well as burglary, endangering the welfare of a child and two weapons offenses. The Appellate Division affirmed, holding among other things that the evidence of kidnapping was legally sufficient (83 AD3d 1113 [3d Dept 2011]). A Judge of this Court granted leave to appeal (17 NY3d 818 [2011]), and we now affirm.

## II

Most people no doubt think they know what "kidnapping" means, but the term is a hard one to define. Penal Law § 135.20 says simply: "A person is guilty of kidnapping in the second degree when he abducts another person." But the statutory definition of "abduct" is more complicated:

> " 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." (Penal Law § 135.00 [2].)

And the statutory definition of "restrain" is more complicated still:

> " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined 'without consent' when such is accomplished by (a) physical force, intimidation or deception, or (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent

person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." (Penal Law § 135.00 [1].)

A final layer of complexity is added by Penal Law § 135.30, which says:

"In any prosecution for kidnapping, it is an affirmative defense that (a) the defendant was a relative of the person abducted, and (b) his sole purpose was to assume control of such person."

We must interpret these statutes to decide whether defendant could be found, on the evidence in this case, to have kidnapped his child. We begin with some relatively easy issues. First, the jury had a basis for rejecting the affirmative defense: It could rationally find that defendant's "sole purpose" was not to "assume control" of the child, but that at least part of his purpose was to prevent his own arrest. Secondly, it is undisputed that defendant threatened to use "deadly physical force" to prevent the police from taking his daughter from him; thus the last part of the definition of "abduct" is not a problem here.

The decisive question is whether defendant "restrain[ed]" the child, according to the statutory definition of that term. Certainly, he intentionally moved the child from one place to another (from the outside of the house to the inside), and also confined her to the place (the bedroom) to which she had been moved. Defendant argues that he did not "restrict" her "movements" or "interfere" with her "liberty" because a six-week-old child is not capable of going or remaining anywhere voluntarily. But this argument is untenable: it implies that no infant could ever be kidnapped. A restriction on movement, and an interference with "liberty," should be deemed to exist whenever the lawful movement of a person, including the lawful movement of a child by adults, is hindered.

It remains to decide whether defendant restricted the child's movements "unlawfully," "without consent" and "with knowledge that the restriction [was] unlawful." He argues that it was impossible for him, a custodial parent with as much right to control the child as Mary had, to act unlawfully or without consent, or to know that he was acting unlawfully, either by moving the child or by preventing her from being moved. As the custodial parent, he says, he could lawfully take the child anywhere he wanted, and the only consent he needed was his

own. Under the statute, he points out, "consent" exists when "the parent, guardian or other person . . . having lawful control or custody" has "acquiesced in the movement or confinement" (Penal Law § 135.00 [1] [b]).

Concededly, defendant had, in general, a right to control his child's movements. Had he put the child in his car and driven her to his home in Brooklyn, his behavior would have been lawful. But we reject the idea that he could lawfully move or prevent the movement of the child in the way he did here, or that he could give "consent" to his own act in doing so; there comes a point where even a custodial parent's control over a child's movements is unlawful, and indeed obviously so.

We have found no New York decision that sheds much light on the issue before us, but courts in other states have faced similar problems. In *State v Viramontes* (163 Ariz 334, 788 P2d 67 [1990]), the Supreme Court of Arizona upheld a kidnapping conviction under a statute that contained a definition of "restrain" much like New York's (*see* Ariz Rev Stat Ann § 13-1301 [2], quoted at 163 Ariz at 336, 788 P2d at 69). The defendant in that case had put his newborn child in a cardboard box, driven it to a restaurant and abandoned it in a parking lot. The court held that, though the defendant was the child's custodial parent, he lacked legal authority to "consent" to his own act of abandonment, observing: "under no imaginable circumstances could the legislature have intended that defendant's . . . taking the child to abandon it be legally authorized" (163 Ariz at 338, 788 P2d at 71).

In *Muniz v State* (764 So 2d 729 [Fla 2d DCA 2000]), a Florida District Court of Appeal confronted a set of facts almost exactly like ours: The defendant there, confronted by police officers demanding that he hand over his month-old child, reacted by picking up a razor and threatening the baby with it, thus holding the officers at bay for hours. The *Muniz* court reversed the defendant's conviction for kidnapping, holding that someone who was a "parent" under Florida law could not be guilty of kidnapping his child when there was no court order depriving him of custody. In a later decision, however, the Florida Supreme Court overruled *Muniz* and held "that a parent is not exempt from criminal liability for kidnapping his or her own child" (*Davila v State*, 75 So 3d 192, 197 [2011]; *see also State v Siemer*, 454 NW2d 857 [Iowa 1990]).

Like the Supreme Courts of Arizona, Florida and Iowa, we conclude that a kidnapping by a custodial parent of his own

child is not a legal impossibility. It is possible, though only in cases, like this one, where a defendant's conduct is so obviously and unjustifiably dangerous or harmful to the child as to be inconsistent with the idea of lawful custody.

Our holding should not be too readily extended. Not every parent who disciplines a child inappropriately—not even every parent who commits child abuse—becomes a kidnapper when he or she causes the child to move from place to place, or to remain stationary. But when a man holds a knife to his child and threatens to murder her if anyone tries to take her from him, a line has been crossed. We hold that, on the facts found by the jury with support in the record, defendant's restriction of his daughter's movements was unlawful; that he could not consent to it, because at the time of the crime he did not have "lawful control or custody" of his daughter; and that the unlawfulness was blatant enough to justify the inference that he knew he was acting unlawfully. The evidence that he committed second-degree kidnapping was legally sufficient.

Defendant's remaining arguments lack merit.

Accordingly, the order of the Appellate Division should be affirmed.

JONES, J. (dissenting). Because I disagree with the majority's holding that the instant defendant's conviction for kidnapping in the second degree was supported by legally sufficient evidence, I respectfully dissent. Here, the People failed to adduce such evidence to prove *all* the elements of kidnapping in the second degree. Moreover, in reaching their holding, the majority has taken defendant's threatened use of force, which amounts to endangering the welfare of a child, an offense for which defendant was prosecuted and convicted, and contrived a scenario whereby an individual whose actions constitute child endangerment may be punished for second-degree kidnapping, an offense which carries significantly greater punishment.

" 'Legally sufficient evidence' [is] competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof" (CPL 70.10 [1]). A court's role in a legal sufficiency review is limited to determining whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson v Virginia*, 443 US 307, 319 [1979] [emphasis omitted]; *see also People v Contes*, 60 NY2d 620, 621

[1983]). As long as the evidence adduced at trial establishes " 'any valid line of reasoning and permissible inferences [that] could lead a rational person' to convict, . . . the conviction survives sufficiency review" (*People v Santi*, 3 NY3d 234, 246 [2004], quoting *People v Williams*, 84 NY2d 925, 926 [1994]). "A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]).

"A person is guilty of kidnapping in the second degree when he abducts another person" (Penal Law § 135.20). Under the Penal Law, the term "abduct" means "to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force" (Penal Law § 135.00 [2]). As set forth in Penal Law § 135.00 (1), the term "restrain" means

> "to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined 'without consent' when such is accomplished by (a) physical force, intimidation or deception, or (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."

Applying the legal sufficiency standard and the relevant kidnapping statutes, the People here failed to adduce legally sufficient evidence as to the "abduct" element (Penal Law §§ 135.20, 135.00 [2]). Specifically, the People failed to establish that (1) defendant's restriction of his then six-week-old daughter's movements or interference with her liberty was unlawful *and* that defendant knew such restriction or interference was unlawful, given that defendant and the child's mother had, at the time of the incident, equal rights of custody over the child, and (2) defendant's child, being under 16 years of age,

was moved or confined "without consent," given that defendant's status as the child's parent necessarily precludes a finding that "the parent . . . having lawful control or custody of [the child] has not acquiesced in the movement or confinement."

This incident arose out of a domestic dispute where defendant sought to exercise his parental right to visit his child and both parents had equal custody rights as to the child. Moreover, this dispute escalated from defendant merely holding his baby to the so-called "kidnapping" after he saw the police arrive at the scene. To be sure, defendant engaged in regrettable, criminal conduct for which he was separately prosecuted. The question is whether defendant, by his acts, committed (or sought to commit) the unlawful act of abducting his child. I submit the evidence here does not support such a conclusion. The evolution of the kidnapping statute supports my position.

At common law, kidnapping was a misdemeanor. However, by 1967, the year the Penal Law (including the kidnapping statute) was substantially revised, kidnapping was a capital offense in most American jurisdictions, including New York (*see* Temp St Commn on Rev of Penal Law and Crim Code, Staff [Commission Staff] Notes, reprinted in NY CLS, Book 23A, Penal Law art 135, at 203; *People v Petre*, 151 Misc 2d 543, 544 [Sup Ct, Queens County 1991], citing 1 Callaghan's Criminal Law in New York § 20:01 [3d ed 1987]).

In 1965, the Commission Staff found the kidnapping statute then in effect (former Penal Law § 1250 [1909]), which treated all situations equally, imposed draconian penalties when applied to certain situations such as parental custody disputes (*see* Commission Staff Notes, *supra*; Note, *The Proposed Penal Law of New York*, 64 Columbia L Rev 1469, 1547 [1964]). As written by the Commission Staff:

> "One of the seemingly incongruous features of the former crime of kidnapping was its application to the parent who, having lost legal custody of a child, took or enticed it from the other parent or person having legal custody (former [Penal Law § 1250 (A) (2)]). Despite the basically civil nature of these 'custody battle' cases, they constituted 'kidnapping'; and the harshness of the situation was hardly eradicated by reduction of the penalty from life imprisonment to a sentence carrying a ten-year maximum term in the case of a 'parent' . . .

"The 1964 study bill excluded these cases from the kidnapping ambit and transferred most of them to a crime entitled 'custodial interference,' a class A misdemeanor in its basic or second degree form and a class E felony in its first degree form, which involved a substantial risk of impairment of the child's health or safety. . . . The new article, makes sixteen years the key age and applies as follows to a 'relative' [including a parent] who takes, entices, restrains or abducts a 'child' without his parents' or lawful guardians' consent, solely for the purpose of assuming control over him:

"(1) Under no circumstances is such 'relative' guilty of 'kidnapping' in either degree (§ 135.30)" (Commission Staff Notes at 204).

Penal Law article 135—the revised kidnapping statute—consists of the primary crime of kidnapping, and two lesser offenses: unlawful imprisonment and custodial interference (*see* Penal Law § 135.00 *et seq.*). Based on the foregoing, the purpose of article 135, at least in part, was to remove child takings that result from parental custody disputes from the type of offenses punishable under the kidnapping statute.*

In spite of the purpose of the amended kidnapping statute, the majority held that "a kidnapping by a custodial parent of his own child is not a legal impossibility" (majority op at 328-329). In support of this holding, the majority relies on decisions of the Supreme Courts of Arizona (*State v Viramontes*, 163 Ariz 334, 788 P2d 67 [1990]), Florida (*Davila v State*, 75 So 3d 192, 196-197 [2011] [held the plain language of the Florida kidnapping statute, Florida Statutes § 787.01 (2000), which requires the State to prove that defendant performed an overt act that confines, abducts or imprisons another person against his or

---

* The accompanying commentary to Penal Law § 135.00 states:
"Examples of conduct which would support a second-degree [kidnapping conviction] . . . include child-stealing by a woman who wants a child for herself; abduction and confinement of a person for a short period in an isolated place in order to prevent that person from engaging in a marriage ceremony; and confinement of a watchman by violence for a few hours for the purpose of advancing a burglary" (Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 135.00, at 319).
This is not an exhaustive list. It merely illustrates the type of conduct that supports a conviction for kidnapping in the second degree.

her will with one of four specific intents enumerated under the statute, does not exempt a parent from criminal liability for kidnapping his child]) and Iowa (*State v Siemer*, 454 NW2d 857, 863 [1990] ["parents may not hide behind the guise of authority to escape punishment for conduct that is proscribed for all others by the kidnapping statute"]). However, the majority's reliance on these cases is misplaced.

These foreign cases interpret statutes different from Penal Law §§ 135.20 and 135.00. The Penal Law, unlike the kidnapping statutes construed by the Florida and Iowa Supreme Courts, separately defines the restriction of movement and lack of consent elements of the term "restrain," and only applies the unlawful use of force concept to the lack of consent element. In other words, our kidnapping statute provides that a parent's use of unlawful force only vitiates the child's consent, not that parent's belief that he or she had a legal right to restrict the child's movements.

*Viramontes* is distinguishable for another reason. In that case, the defendant fathered a child by his 13-year-old stepdaughter and to conceal the birth, he took the newborn from the mother, placed the child in a cardboard box, and abandoned the child in the parking lot of a McDonald's restaurant (*see Viramontes*, 163 Ariz at 335, 788 P2d at 68). The Supreme Court of Arizona held that the defendant, the father of the child, can be convicted of kidnapping where the defendant's intent in restraining the child is for an act enumerated in the kidnapping statute (163 Ariz at 336, 788 P2d at 69). Because that court determined that the defendant's restraint of his child was prompted by his intent to abandon the child, which is an Arizona felony, the defendant's actions were plainly within the unambiguous language of the Arizona kidnapping statute (*id.*). Contrary to *Viramontes*, the evidence in this case establishes that defendant's actions as to his daughter were prompted by an intent to assume control over the child and exercise his parental right to visit her.

The majority, relying on the cited foreign cases, further concluded that "[i]t is possible, though only in cases, like this one, where a defendant's conduct is so obviously and unjustifiably dangerous or harmful to the child as to be inconsistent with the idea of lawful custody" (majority op at 329). However, the holdings of the cited foreign cases, which are factually distinct from the case before us, were based on their own unique facts and kidnapping statutes; as such, they do not support the majority's position that defendant's conduct here was inconsistent with the concept of lawful custody.

Another troubling aspect of the majority's conclusion is that it condones punishing defendant for second-degree kidnapping when his actions amounted to endangering the welfare of a child (Penal Law § 260.10 [1] ["A person is guilty of endangering the welfare of a child when . . . (h)e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old"]), a criminal offense for which he was convicted. Here, the majority has engaged in a tortured analysis of the relevant kidnapping statutes and determined that this defendant's commission of acts constituting child endangerment satisfied the "abduct" element of second-degree kidnapping. In my view, this sort of bootstrapping is unacceptable.

Based on the foregoing, I conclude that the evidence adduced at trial was legally insufficient to support defendant's conviction for second-degree kidnapping, and would modify the order of the Appellate Division by vacating defendant's kidnapping conviction and dismissing so much of the indictment as charged kidnapping in the second degree; and, as modified, affirm the order of the Appellate Division.

Chief Judge LIPPMAN and Judges GRAFFEO and READ concur with Judge SMITH; Judge JONES dissents in part and votes to modify in a separate opinion in which Judges CIPARICK and PIGOTT concur.

Order affirmed.