FILED
United States Court of Appeals
Tenth Circuit

February 13, 2018

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

BLACK & VEATCH CORPORATION,

    Plaintiff - Appellant,

v.

                                No. 16-3359

ASPEN INSURANCE (UK) LTD;
LLOYD'S SYNDICATE 2003,

    Defendants - Appellees.
_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:12-CV-02350-SAC)**
_____

David T. Dekker of Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C. (David L. Beck of Pillsbury Winthrop Shaw Pittman LLC, Washington, D.C. , and Roy Bash of Polsinelli PC, Denver, Colorado, with him on the brief) for Plaintiff – Appellant.

Robert J. Franco (Andrew C. Patton and Scott O. Reed with him on the brief), of Franco & Moroney, LLC, Chicago, Illinois, for Defendants – Appellees.
_____

Before **BRISCOE**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

    This case is an insurance coverage dispute between Plaintiff-Appellant Black &

Veatch Corporation ("B&V") and Defendants-Appellees Aspen Insurance (UK) Ltd. and

Lloyd's Syndicate 2003 (collectively, "Aspen"). The issue is whether Aspen must

reimburse B&V for the costs B&V incurred due to damaged equipment that its subcontractor constructed at power plants in Ohio and Indiana. The district court held that Aspen need not pay B&V's claim under its commercial general liability ("CGL") insurance policy (the "Policy") because B&V's expenses arose from property damages that were not covered "occurrences" under the Policy. Because the only damages involved here were to B&V's own work product arising from its subcontractor's faulty workmanship, the court concluded that the Policy did not provide coverage and granted Aspen's motion for partial summary judgment. B&V appealed.

The district court had diversity jurisdiction under 28 U.S.C. § 1332. We exercise appellate jurisdiction under 28 U.S.C. § 1291. Because we predict that the New York Court of Appeals would decide that the damages here constitute an "occurrence" under the Policy, we vacate the court's summary judgment decision and remand for further consideration in light of this opinion.

## I. BACKGROUND

### A. *Factual Background*

B&V is a global engineering, consulting, and construction company. A portion of its work involves "EPC contracts." "EPC" stands for engineering, procurement, and construction. Under an EPC contract, B&V delivers services under a single contract. It supervises the project and typically subcontracts most—if not all—of the actual procurement and construction work.

1. **Underlying Claim Against B&V for Property Damages**

In 2005, B&V entered into EPC contracts with American Electric Power Service Corporation ("AEP") to engineer, procure, and construct several jet bubbling reactors ("JBRs"), which eliminate contaminants from the exhaust emitted by coal-fired power plants.[1] For at least seven of these JBRs, which were located at four different power plants in Ohio and Indiana, B&V subcontracted the engineering and construction of the internal components to Midwest Towers, Inc. ("MTI"). Deficiencies in the components procured by MTI and constructed by MTI's subcontractors caused internal components of the JBRs to deform, crack, and sometimes collapse.

After work on three of the JBRs was completed, and while construction of four others was ongoing, AEP alerted B&V to the property damage arising from MTI's negligent construction. AEP and B&V entered into settlement agreements resolving their disputes relating to the JBRs at issue here. Under the agreements, B&V was obligated to pay more than $225 million in costs associated with repairing and replacing the internal components of the seven JBRs.

## 2. **The B&V-Aspen CGL Policy**

B&V had obtained several insurance policies to cover its work on these JBRs.[2] Zurich American Insurance Company ("Zurich") provided the primary layer of coverage

---

[1] AEP entered the EPC contracts in its own capacity and as an agent for other power companies. We refer to these companies collectively as "AEP."

[2] B&V entered the Lloyd's of London ("Lloyd's") insurance market to negotiate an insurance policy that would cover its potential liability as an EPC contractor. Lloyd's is not an insurance company but rather a specialist insurance market within which multiple financial backers come together to pool and spread risk. U.S.-based insurance brokers cannot directly access the Lloyd's insurance market, so B&V's brokers were

for up to $4 million for damage to completed work. Under the CGL Policy at issue here,

Aspen provides the first layer of coverage for claims exceeding the Zurich policy's

limits.[3] The Policy limits coverage up to $25 million per occurrence and $25 million in

the aggregate. The structure of the Policy consists of (a) a basic insuring agreement

defining the general scope of coverage, (b) exclusions from coverage, and (c) exceptions

to the exclusions.

> a. *Basic insuring agreement*

> The Policy's basic insuring agreement reads:

> We [the Insurer] will pay on behalf of the "Insured" those sums in excess of the [liability limit provided by other insurance policies] which the "Insured" by reason of liability imposed by law, or assumed by the "Insured" under contract prior to the "Occurrence", shall become legally obligated to pay as damages for:

>> (a) "Bodily Injury" or "Property Damage" . . . caused by an "Occurrence" . . .

ROA, Vol. 1 at 68.

> It defines the key terms as follows:

- Occurrence: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured'." *Id.* at 71.

- Property Damage: "physical injury to tangible property of a 'Third Party', including all resulting loss of use of that property of a 'Third Party' . . . ." *Id.* at 72.

---

required to use an intermediary known as a "wholesale" broker to negotiate the insurance policy.
[3] Liberty Mutual Insurance Europe (UK), Ltd. provided the second layer of excess coverage.

4

- Third Party: "any company, entity, or human being other than an 'Insured' or other than a subsidiary, owned or controlled company or entity of an 'Insured'." *Id.*

In sum, the Policy covers damages arising from an "occurrence," which includes an accident causing damage to the property of a third party. It does not define "accident."

b. *Exclusions*

Following the basic insuring agreement, the Policy then scales back coverage through several exclusions, two of which are relevant here. The first, known as the "Your Work" exclusion, or "Exclusion F," excludes coverage for property damage to B&V's own *completed* work. It reads:

> This policy does not apply to . . . 'Property Damage' to 'Your Work' arising out of it or any part of it and included in the 'Products/Completed Operations Hazard.'

*Id.* at 74. "Products/Completed Operations Hazard" refers to property damage or bodily injury arising out of completed work. *Id.* at 72. "Your Work" is defined as "work operations performed by you or on your behalf" by a subcontractor. *Id.* at 73. References to B&V's own work thus include work done by B&V as well as MTI.

The second exclusion, known as "Endorsement 4," excludes coverage for property damage to the "particular part of real property" that B&V or its subcontractors were working on when the damage occurred. *Id.* at 83. This exclusion pertains only to *ongoing*, rather than completed, work.

c. *Exception*

5

The "Your Work" exclusion is subject to an exception, thus restoring some coverage. The exception provides that "[the 'Your Work' exclusion] does not apply if the damaged work or the work out of which the damage arises was *performed on [B&V's] behalf by a subcontractor*." *Id.* at 74 (emphasis added). In other words, the Policy does not cover property damage to B&V's own completed work *unless* the damage arises from faulty construction performed by a subcontractor. We refer to this as the "subcontractor exception."

## B. *Procedural History*

B&V submitted claims to its liability insurers for a portion of the $225 million it cost to repair and replace the defective components. After B&V recovered $3.5 million from Zurich, its primary insurer,[4] it sought excess recovery from Aspen. Aspen denied coverage. B&V sued Aspen in federal district court for breach of contract and declaratory judgment as to B&V's rights under the Policy. B&V sought coverage for approximately $72 million, a portion of the total loss. On cross-motions for partial summary judgment on the coverage issue, the court sided with Aspen, holding that damage arising from construction defects was not an "occurrence" under the Policy unless the damage occurred to something *other* than B&V's own work product. Because

---

[4] Zurich paid its full completed operations aggregate limit of $4 million, less the $500,000 deductible, for the damages incurred.

6

the damages here occurred only to the B&V's own work product—the JBRs—the court found they were not covered.[5]  This appeal followed.

## II.  **DISCUSSION**

We begin with our standard of review.  We then discuss standard-form CGL policies, relevant New York law regarding CGL policies and insurance contract interpretation, and the relevance of our decision in *Greystone Construction, Inc. v. National Fire & Marine Insurance Co.*, 661 F.3d 1272, 1289 (10th Cir. 2011), which addressed a similar coverage issue.  Interpreting the Policy in light of applicable law, we conclude the district court erred in determining that a subcontractor's faulty workmanship causing damage to an insured's own work can never be an "occurrence."

The threshold and primary question is whether the New York Court of Appeals, the highest court in the State of New York,  would hold that the Policy's basic insuring agreement covers the property damage to the JBRs as an "occurrence."  *Greystone*, 661 F.3d at 1282 (explaining that in the absence of a decision by the highest court of a state, we follow a decision by an intermediate court unless we find a convincing reason to do otherwise).  We conclude the damages constitute an "occurrence" under the Policy because they were accidental and harmed a third party's property.  Further, a contrary reading would render the "subcontractor exception" and "Endorsement 4" mere surplusage, in violation of New York law.  The subcontractor exception does not create coverage.  Only the basic insuring agreement can do that.  But the subcontractor

---

[5] As described above, the Policy defines B&V's "work" as work performed by B&V or by a subcontractor on B&V's behalf.  *See* ROA, Vol. 1 at 73.

exception informs our understanding of an "occurrence" based on New York's rule that we should read the insurance policy as a whole and avoid interpretations that render provisions meaningless. Applying these analytical tools, we predict the New York Court of Appeals would conclude that the damages at issue here are "occurrences" under the Policy's basic insuring agreement.

New York state court decisions have not resolved whether subcontractor damages can be deemed an "occurrence" under a CGL policy containing a subcontractor exception. The district court and Aspen contend that New York courts have answered this question, relying heavily on *George A. Fuller Co. v. United States Fidelity and Guaranty Co.*, 613 N.Y.S.2d 152, 153 (N.Y. App. Div. 1994), and other intermediate appellate court decisions. But they ignore a critical distinction between *Fuller* and the present case. The court in *Fuller* considered a CGL policy that *excluded* coverage for damages to an insured's own work, whether the damage was caused by the contractor or a subcontractor. Unsurprisingly, *Fuller* concluded that the particular policy in that case was not intended to insure against faulty workmanship in the work product itself. *Id.* at 155. The decision offered no analysis regarding policies, such as the one here, explicitly stating that damages to an insured's own work *are* covered when a subcontractor, rather than the contractor itself, performed the faulty workmanship. In other words, *Fuller* does not stand for the proposition that damages caused by a subcontractor's faulty workmanship can never constitute an "occurrence" under a CGL policy. For this and other reasons more fully explained below, *Fuller* and the cases that

8

rely on it are inapt and distinguishable. We thus reverse the district court's holding that denied coverage and remand for further proceedings in light of this opinion.[6]

## A. *Standard of Review*

We review summary judgment de novo and apply the same legal standard as the district court. *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 849 (10th Cir. 2015). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Cornhusker*, 786 F.3d at 850. We also review legal questions de novo, including the district court's interpretation of New York law, which the parties agree governs here. *See Bird v. West Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.* (quotations omitted).

## B. *Standard-Form CGL Policies*

A CGL policy covers the costs a policyholder incurs due to property damage and bodily injury. *See* Donald S. Malecki, *Commercial General Liability Coverage Guide*, The National Underwriter Company at 9 (10th ed. 2013) ("*CGL Coverage Guide*"). In this section, we describe: (1) the structure and (2) the history and development of CGL policies.

---

[6] The district court held only that the damages at issue here could not constitute a coverage-triggering "occurrence" under the Policy, so it did not proceed to the next step of determining the effect of any Policy exclusions or exceptions to the exclusions. It should do so on remand.

1. **Structure of Standard-Form CGL Policies**

Most CGL policies are drafted using standardized forms developed by the Insurance Services Office, Inc. ("ISO"), an association of insurance carriers. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993). ISO maintains a large portfolio of "endorsements," language that can be used to amend a standard CGL policy to suit the needs of the insured or insurer. *CGL Coverage Guide* at 177. Policies that deviate from the standard CGL policy forms and endorsements are called "manuscript" policies. *See Gabarick v. Laurin Mar. (Am.), Inc.*, 650 F.3d 545, 554 (5th Cir. 2011) (explaining that manuscript policies are tailored to the unique coverage needs of the insured); *Bangert Bros. Const. Co. v. Americas Ins. Co.*, 66 F.3d 338, at *2 (10th Cir. 1995) (unpublished table decision).

The basic structure of standard CGL policies mirrors the three-part structure of the B&V-Aspen Policy described above. CGL policies begin with the "basic insuring agreement" defining the initial scope of coverage. An insured cannot recover for property damages that fall outside this definition. The basic insuring agreement is then subject to exclusions, which narrow the scope of coverage. The exclusions are then subject to exceptions, which restore coverage—but only to the extent coverage was initially included in the basic insuring agreement.

a. *Basic insuring agreement*

CGL policies begin with a broad grant of coverage in the basic insuring agreement. An "occurrence" triggers coverage. CGL policies—including the Policy here—define an "occurrence" as "an accident, including continuous or repeated exposure

10

to substantially the same general harmful conditions." *CGL Coverage Guide*, App. K: 2013 Claims-Made Form, at 558. Neither the standard CGL policy nor the Policy in this case defines the term "accident."

  b. *Exclusions—and exceptions to exclusions*

    i. Overview

The scope of the basic insuring agreement for damages caused by an "occurrence" is then limited by any exclusions from coverage that the parties include in the policy. In other words, a CGL policy starts with a broad grant of coverage for damages arising from an "occurrence." Exclusions narrow the scope of coverage. For example, CGL policies generally exclude coverage for damages that the insurer "expected or intended." *See id.* at 543. Exceptions to the exclusions may restore—but do not create—coverage.

    ii. The "Your Work" exclusion and "subcontractor exception"

One of the standard-form CGL exclusions and its corresponding exception is identical to the "Your Work" exclusion and "subcontractor exception" in the Policy here. *See CGL Coverage Guide*, App. K: 2013 Claims-Made Form, at 547.[7] In the standard-form CGL policy, this exclusion is listed as "Exclusion L." *Id*. In the Policy, it is listed as "Exclusion F." For consistency, we refer to this provision as the "Your Work" exclusion.

---

[7] Under this exclusion, a CGL insurance policy does not apply to "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" *CGL Coverage Guide*, App. K: 2013 Claims-Made Form, at 547.

As in the Policy and the standard-form CGL policy, the "subcontractor exception" follows the "Your Work" exclusion. This exception provides that the "Your Work" exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." *Id.*

2. **History and Development of CGL Policies**

The history and development of CGL policies guide our interpretation of the Policy at issue here.[8] The standard-form CGL policy has undergone several revisions since the first one was promulgated in 1940. The 1973 standard-form CGL policy precluded coverage for property damage to an insured's own completed work, regardless of whether the damages were caused by work completed by the contractor or "on [its] behalf" by a subcontractor. *CGL Coverage Guide*, App. A: 1973 CGL Form (excluding coverage for "property damage to work performed by *or on behalf of* the named insured" (emphasis added)); *see* Christopher C. French, *Revisiting Construction Defects as "Occurrences" Under CGL Insurance Policies*, 19 U. Pa. J. Bus. L. 101, 107 (2016) ("French"). The 1973 version of the "Your Work" exclusion did not contain a subcontractor exception. Instead, subcontractor-caused damage was considered a risk inherent to the construction business and explicitly excluded from coverage in CGL policies.

By 1976, general contractors, who were increasingly reliant on subcontractors' work, had become dissatisfied with the lack of CGL policy coverage when the general

---

[8] As explained above, the key policy language at issue in this case is materially identical to the language used in standard-form CGL policies.

contractor was not directly responsible for defective work.  *See* Steven Plitt et al., 9A

Couch on Ins. § 129:19 (3rd ed. 2017) ("Plitt").  In response, the 1976 standard-form

CGL policy eliminated the phrase "or on behalf of" from the "Your Work" exclusion.

The policy thus broadened coverage by no longer excluding damages arising from faulty

subcontractor work.  Contractors could pay a higher premium to add additional coverage

for property damage arising from completed work that had been performed by

subcontractors.  *Id.*; *see also* French at 107.  This optional coverage provision was known

as the "Broad Form Property Damage Endorsement" ("BFPD Endorsement") and

provided that the policy only excluded "property damage to completed work performed

by the named insured."  *CGL Coverage Guide*, App. A: Broad Form Endorsement,

at 295; *see also* Plitt at § 129:19.  "Unfortunately, the courts [have failed to] recognize

the importance of this language change."  Philip L. Bruner, et al., § 11:259 *Completed*

*operations work exclusion—Generally*, Bruner & O'Connor Construction Law (2017)

("Bruner").

In 1986, the ISO attempted to clear up this confusion by expressly stating in the

standard-form CGL policy that the "Your Work" exclusion does not apply "if the

damaged work . . . was performed . . . by a subcontractor."  *See CGL Coverage Guide*,

App. B: 1986 Occurrence Form, at 299; *see also* Bruner at § 11:259.  Since then, the ISO

standard-form CGL policy has contained materially identical language to the "Your

Work" exclusion and "subcontractor exception" language that appears in the Policy here.

The ISO explained that this revision was intended to clarify that CGL policies "cover[ed]

. . . *damage to, or caused by*, a subcontractor's work after the insured's operations are

13

completed." Ins. Servs. Office, Inc., *Commercial General Liability Program Instructions Pamphlet*, Circular No. GL-86-204 (July 15, 1986) ("ISO 1986 Circular") (emphasis added). The "Your Work" exclusion, in other words, is inapplicable when damage arises from a subcontractor's faulty workmanship.

As one commentator explained, by 1986, insurance carriers and policyholders agreed that CGL policies should cover defective construction claims "so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself." French at 108 (quoting 2 Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.13[D], at 14-224.8 (3d ed. Supp. 2007) ("Stempel")). "This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage." *Id.* (quoting Stempel at 14-224.8).

In the context of *ongoing* work, the standard-form CGL policy excludes coverage for property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working . . . on your behalf are performing operations, if the 'property damage' arises out of those operations." *CGL Coverage Guide*, App. B: 1986 Occurrence Form, at 298; *see also* ISO 1986 Circular (explaining that the policy covers "damage caused by faulty workmanship to . . . parts of work in progress" other than what the contractor or subcontractors were working on). In other words, the policy excludes damage to "that particular part" of the project upon which the insured's operations were being performed at the time the damage occurred, but it covers damage to property other than "that particular part." This is the current understanding of the phrase "that particular

14

part" in the insurance industry today. Scott C. Turner, *"That particular part" limitation, Insurance Coverage of Construction Disputes* § 29:7 (2d ed. 2017).

In sum, since 1986, the standard-form CGL policy has covered the cost of property damage to (1) completed projects, when the damage is due to subcontractors' faulty work, and (2) ongoing work, when faulty workmanship damages property other than "that particular part" on which the contractor or subcontractor was working at the time the damage occurred. Again, this assumes that a CGL policy's basic insuring agreement provides coverage for such damages in the first instance.

### C. *New York Law Interpreting CGL Policies*

#### 1. **Definition of "Accident"**

Neither the standard-form CGL policy nor the Policy here defines the term "accident." The New York Court of Appeals has held that damages are accidental so long as they are "unexpected and unintentional." *Cont'l Cas. Co. v. Rapid-American Corp.*, 609 N.E.2d 506, 510 (N.Y. 1993). These terms are to be construed as barring coverage "*only* when the insured *intended* the damages." *Id*. (emphases added). The fact that an insured might have foreseen the possibility that its subcontractor would build a defective product does not render the resulting damages intentional—and thus not covered—under the policy. *See id.* (acknowledging that a policyholder might take a "calculated risk" without expecting or intending the resulting damages).

#### 2. **General Principles of Contract Interpretation**

New York courts recognize that "[a]n insurance agreement is subject to principles of contract interpretation." *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481

15

(N.Y. 2017) (quotations omitted). "[I]n determining a dispute over insurance coverage, [courts] first look to the language of the policy." *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 991 N.E.2d 666, 671 (N.Y. 2013) (quotations omitted). In doing so, they must "construe the [CGL] policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Id.* at 671-72 (quotations omitted) (applying the rule in determining whether separate incidents constituted one or multiple "occurrences" under a CGL insurance policy). The New York Court of Appeals recently reiterated this rule in *In re Viking Pump, Inc.*, explaining that an interpretation of a contract that renders a provision surplusage is one "that cannot be countenanced under [New York courts'] principles of contract interpretation." 52 N.E.3d 1144, 1154 (N.Y. 2016) (citing *Roman Catholic Diocese*, 991 N.E.2d at 666).

## D. *Relevance of* Greystone

The parties discuss this court's *Greystone* decision in their briefs, and we wish to address its relevance to this case. In *Greystone*, the issue was "whether property damage caused by a subcontractor's faulty workmanship is an 'occurrence' for purposes of a [CGL] policy." 661 F.3d at 1276. Homeowners had sued a general contractor, asserting defective construction by a subcontractor that had installed the foundation of the home. The claim was premised on the theory that the house was damaged due to a subcontractor's negligent design and construction of the home's soil-drainage and structural elements, which exposed the foundation to shifting soils. *Id.* Over time, soil expansion caused the foundation to shift, resulting in extensive damage to the upper

16

living area. *Id.* The contractor sought coverage from its insurer. *Id.* We determined that some of the damages constituted an "occurrence" under the policy.

Although Colorado law applied, a significant portion of the opinion was not tied to Colorado law. Interpreting the policy, which was materially the same as the Policy here, this court followed the strong trend of state supreme court case decisions interpreting the term "occurrence" to encompass accidental damage to property resulting from poor workmanship. *Id.* at 1282-83 (collecting cases). The panel also relied on general principles of contract interpretation—such as construing the policy in accordance with its plain meaning and avoiding surplusage—which are the same principles under New York law and equally applicable here. In this regard, *Greystone* is relevant and helpful to our analysis in this case.[9]

_____

[9] *Greystone*, however, is inapplicable here to the extent it relied on Colorado law that varies from New York law. Colorado, for example, defines "accident" more narrowly—damages are accidental when they are "unanticipated" or "unforeseeable." *See Greystone*, 661 F.3d at 1285 (citing *Union Ins. Co. v. Hottenstein*, 83 P.3d 1196, 1201 (Colo. App. 2003)). Because a contractor's "obligation to repair defective work is neither unexpected nor unforeseen," damage to the contractor's work arising from defective construction was not accidental. *Id.* at 1286. Applying Colorado law, *Greystone* concluded that such damages—i.e., to the home's soil-drainage and structural elements—were not a covered "occurrence" under the policy. *Id.* "Conversely, when a subcontractor's faulty workmanship causes unexpected property damage to otherwise *nondefective* portions of the builder's work, the policies provide coverage." *Id.* (emphasis added). *Greystone* defined "nondefective property" as "property that has been damaged as a result of poor workmanship." *Id.* at 1284. The damage to the home's upper living areas was thus a covered "occurrence."

New York law, by contrast, provides that damages are non-accidental "*only* when the insured *intended* the damages." *Cont'l Cas. Co.*, 609 N.E.2d at 510 (emphases added). Thus, even if damages were anticipated or foreseeable, they would still be accidental—unless the contractor intended that they occur. Greystone's definition of "accident," and its resulting distinction between defective and nondefective work, is thus linked to Colorado law that differs from New York's broader construction of the term

17

E. *Analysis*

The issue is whether the New York Court of Appeals would find that B&V's policy with Aspen covers a portion of the payments that B&V made to AEP to repair and replace the damaged JBRs. Our analysis concludes that it would, based on (1) the Policy's language and New York's rule against surplusage, (2) the history and development of CGL policies, (3) the trend among state supreme courts, and (4) the lack of New York appellate court decisions precluding a finding of "occurrence" under this particular Policy.[10]

1. **Damage to the JBRs Was an "Occurrence" Under the Policy**

We first address whether, under New York contract law, B&V is seeking payment from Aspen for a covered "occurrence"—the first step necessary for obtaining coverage under a CGL insurance policy. *See Greystone*, 661 F.3d at 1281. CGL insurance policies are contracts, *see Roman Catholic Diocese*, 991 N.E.2d at 671, which New York courts interpret in light of their plain meaning, *Callahan v. Carey*, 909 N.E.2d 1229, 1233 (N.Y. 2009). We start with the Policy terms and definitions, which are materially

---

"accident." In any event, counsel for B&V said at oral argument that "all of the damage [B&V] seek[s] in this case is to nondefective work," *see* Oral Arg. at 2:41-46, so any distinction between defective and nondefective work is immaterial here.

[10] The dissent contends that in determining how the New York Court of Appeals would decide this case, "we must apply relevant New York case law," Dissent at 3. We agree. The dissent overlooks that this opinion draws from cases decided by the New York Court of Appeals to support its analysis, including cases defining "accident" for purposes of determining CGL policy coverage and providing principles of contract interpretation to understand CGL policy terms. For example, in *Viking Pump*, the New York Court of Appeals reaffirmed the key principle that contracts must be read to avoid rendering any provision surplusage.

18

identical to the ISO's standard-form CGL policy. Under the Policy, an "occurrence" is an "accident . . . that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured.'" An occurrence triggers coverage. We examine each part of this definition.

a. *Accidental damages*

The Policy does not define "accident," but the New York Court of Appeals has explained that a CGL policy covers damages only when they were "unexpected and unintentional." *Cont'l Cas. Co.*, 609 N.E.2d at 510 (holding that these terms are to be construed narrowly as barring coverage "only when the insured intended the damages"); *see also Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 692 (N.Y. 2002) ("Insurance policies generally require 'fortuity' and thus implicitly exclude coverage for intended or expected harms."). A policyholder might take a "calculated risk"—such as hiring a subcontractor—without "expecting" damages to occur. *See Cont'l Cas. Co.*, 609 N.E.2d at 510. "[I]n fact, people often seek insurance for just such circumstances." *Id.*

Whether or not B&V took a "calculated risk" by delegating work on the JBRs to a subcontractor, Aspen does not argue—nor does the record support—that B&V "expected or intended" MTI or any other subcontractor to cause damage. Nor is there evidence that B&V increased the likelihood of such damages through reckless cost-saving or other measures. *See Fuller*, 613 N.Y.S.2d at 155 (finding no "occurrence" where damages

19

arose from "intentional cost-saving or negligent acts"). Thus, the damages at issue here satisfy the Policy's accidental requirement.[11]

   b. *Property damage to a third party*

The Policy covers costs arising from property damage.[12] "Property Damage" is defined as "physical injury to tangible property of a 'Third Party.'" ROA, Vol. 1 at 72. A "Third Party" is defined as "any company, entity, or human being other than an 'Insured.'" *Id.* The damage to the JBRs was physical injury to tangible property. Aspen argues, however, that the Policy designates AEP—the energy company that hired B&V to construct the JBRs—as an "Additional Insured," and thus AEP cannot be a third party. *See* Aplee. Br. at 45 (citing ROA, Vol. 7 at 1311). This argument fails.

Under the Policy, an "Insured" is defined as any entity listed as a "Named Insured" or designated as an "Additional Insured." The Policy lists B&V as the "Named

---

[11] We acknowledge that the definition of "occurrence" in the Policy at issue here differs slightly from the definition in ISO's standard-form CGL policy, but this difference is not substantive and is immaterial to our analysis. The Policy here defines "occurrence" as an accident that was not "expected or intended." The "expected or intended" language is part of the definition of "occurrence." Until 1986, standard-form CGL policies also included the "expected or intended" language as part of the definition of "occurrence." *See CGL Coverage Guide*, App. A: GL Policy Jacket Provisions, at 287. But because courts had been treating the language as an exclusion, in 1986 the ISO formally moved the language out of the "occurrence" definition and into the exclusions section of CGL policies. *See id.* App. B: 1986 Occurrence Form, at 297; *see also* French at 106. "This move, however, did not change the analysis of whether there has been an occurrence." French at 106.

[12] The Policy also covers "bodily injury." *See* ROA, Vol. 1 at 81.

Insured."[13]  ROA, Vol. 1 at 63.  Under Endorsement 33, AEP is designated as an

"Additional Insured," thereby adding AEP to B&V's existing insurance policy.  *See id.*

at 114.  Granting one party additional insured status on another's CGL policy is a

"common risk-shifting technique" used in construction contracts.  Samir Mehta,

*Additional Insured Status in Construction Contracts and Moral Hazard*, 3 Conn. Ins. L.J.

169, 170 (1997).  But it does not mean the Policy precludes coverage of the damages

at issue here.

First, AEP is an "Additional Insured" only with respect to liability for property

damage "arising out of operations performed *by the Named Insured*."  ROA, Vol. 1 at

114 (emphasis added).  But here the work performed by a *subcontractor* (MTI), not by

the "Named Insured" (B&V), caused the damages.[14]

Second, Endorsement 33 contains a "separation of insureds" condition, which

provides that the Policy "applies separately to each Insured against whom claim is made

or suit is brought."  *Id*.  Its purpose is to preserve coverage for damage claims made by

one insured (here, AEP) against another (B&V).  *See West Am. Ins. Co. v. AV&S*, 145

F.3d 1224, 1227 (10th Cir. 1998) (providing that under a "separation of insureds"

condition, each insured is "entitled to have the [p]olicy construed as to it as if the [p]olicy

were issued only as to it alone"); *see also Greaves v. Pub. Serv. Mut. Ins. Co.*, 155

---

[13] Endorsement 34 adds additional entities to the "Named Insured" list (e.g., Black & Veatch Europe Inc., Black & Veatch (UK) Limited, and Black & Veatch Thailand Limited).  AEP is not listed.

[14] Endorsement 34 does not add MTI as another "named insured," and thus the endorsement is immaterial to our analysis.

21

N.E.2d 390, 392 (N.Y. 1959) (same). In other words, when AEP claimed damages against B&V, the separation of insureds clause rendered AEP a third party with respect to its claims for property damage against B&V. This understanding of the Policy aligns with common sense: The principle risk B&V faced as an EPC contractor, and thus a main reason for obtaining CGL insurance, was the potential for claims alleging damages made by the property owner—AEP.

c. *Rule against surplusage*

The foregoing discussion establishes that the property damage to the JBRs constitutes an "occurrence" under the Policy. Concluding otherwise would violate the New York Court of Appeal's rule against surplusage—a point the dissent ignores. In other words, Aspen's interpretation of "occurrence" as excluding the damages at issue here would render several Policy provisions meaningless in violation of New York contract interpretation rules. *See Roman Catholic Diocese*, 991 N.E.2d at 671.

i. The "Your Work" exclusion and "subcontractor exception"

The "Your Work" exclusion (listed as "Exclusion F") in the Policy excludes coverage for property damage to the insured's own completed work. ROA, Vol. 1 at 74 (providing that the Policy "does not apply to . . . 'Property Damage' to 'Your Work' arising out of it or any part of it and included in the 'Products/Completed Operations Hazard'"). The next sentence, however, provides an exception—the "subcontractor exception"—restoring some coverage. *Id.* It states that the "Your Work" exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." *Id.*

22

Aspen's interpretation of "occurrence" would render these provisions superfluous in violation of New York law requiring that CGL policies be construed "in a way that affords a fair meaning to all of the language . . . in the contract and leaves no provision without force and effect." *Roman Catholic Diocese*, 991 N.E.2d at 671-72 (quotations omitted) (applying rule against surplusage to CGL policies); *see Viking Pump*, 52 N.E.3d at 1154. It would be redundant to say the Policy does not cover property damage to B&V's own work (as stated in the "Your Work" exclusion) if the definition of "occurrence" categorically and preemptively precludes coverage for such damages in the first instance.[15]

Similarly, there would be no reason for the Policy to state that it covers damages to the insured's work when "the damaged work . . . was performed . . . by a subcontractor" if the basic insuring agreement does not encompass these damages. *See* ROA, Vol. 1 at 74; *see also Greystone*, 661 F.3d at 1289 ("[T]he only way [the 'Your Work' exclusion and 'subcontractor exception' have] effect is if we find that physical injury caused by poor workmanship . . . may be an occurrence under standard CGL policies."); *see also Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007) ("By incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance."); *Great Am. Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1282 (D. Utah 2006) ("[I]t is undeniable that

---

[15] Again, the Policy defines "Your Work" as work performed either by B&V or its subcontractors. The JBRs are thus B&V's "work" under the Policy, even though MTI engineered and constructed them.

excluding faulty subcontractor work from the definition of 'occurrence' would reduce the operation of the subcontractor exception so drastically that the language would virtually cease to be of any meaningful effect.")

Aspen argues B&V cannot rely on the "subcontractor exception" because—as an exception to an exclusion—it cannot *create* coverage that does not already exist under the Policy's basic insuring agreement. But as we have explained, the "subcontractor exception" does not create coverage, the Policy's basic insuring agreement does. Its definition of "occurrence" encompasses damage to B&V's own work arising from faulty subcontractor workmanship. The "Your Work" exclusion and "subcontractor exception," which would lose their meaning under Aspen's definition of "occurrence," only provide further evidence that our reading of the Policy is correct. Neither Aspen nor the district court adequately squares their position with New York's rule against surplusage.

ii. "Endorsement 4"

Aspen's interpretation of an "occurrence" would also render "Endorsement 4" surplusage. As described above, "Endorsement 4" pertains to ongoing work and excludes coverage for property damage to "*that particular part* of real property" on which B&V or its subcontractors were actively working. *See* ROA, Vol. 1 at 83 (emphasis added). If faulty workmanship resulting in damage to B&V's own work could never trigger coverage as an "occurrence," this part of "Endorsement 4" would be meaningless. In other words, there would be no reason for "Endorsement 4" to exclude coverage only for damage to a "particular part" of the JBRs if the Policy could never cover damage to the insured's work in the first instance.

24

* * * *

In sum, the property damages at issue were caused by an "occurrence," as that term is defined in the Policy, because (1) B&V neither intended nor expected that its subcontractor would perform faulty work, so the damages were accidental, (2) the damages involved physical harm to the property of a third party, and (3) a contrary conclusion would render various Policy provisions meaningless in violation of New York's rule against surplusage.

2. **History of CGL Policies Supports Finding of "Occurrence"**

The history of standard-form CGL policies further demonstrates that the Policy covers the costs arising from the property damages here. As described in greater detail above, early versions of the "Your Work" exclusion precluded coverage for property damages due to the faulty work of the general contractor or its subcontractor. By 1976, general contractors had become more reliant on subcontractors and were frustrated by the lack of coverage offered by CGL policies for damages caused by subcontractor's work. Plitt § 129:19. In response, the ISO narrowed the exclusion by removing the reference to subcontractors and thus implicitly extending coverage for contractors when the property damage alleged was caused by the work of subcontractors. *Id.*

After courts failed to recognize the importance of this language change, the ISO attempted to clarify its 1976 revisions by adding the "subcontractor exception" to standard-form CGL policies. *See id.*; Bruner § 11:259; French at 108 (explaining this change was driven by agreement between contractors and insurers that CGL policies should cover defective construction claims "so long as the allegedly defective work had

25

been performed by a *subcontractor* rather than the policyholder itself" (quoting Stempel at § 14.13[D]) (emphasis added)). Aspen and the cases it cites, which we discuss below, ignore these changing dynamics and ISO's own explanation that the 1986 changes clarified that CGL policies covered "*damage to*, or *caused by*, a subcontractor's work after the insured's operations are completed." ISO 1986 Circular (emphases added).

3. **Trend Among State Supreme Courts Supports Finding of "Occurrence"**

State supreme courts that have considered the issue since 2012 have reached "near unanimity" that "construction defects *can* constitute occurrences and contractors have coverage under CGL policies at least for the unexpected damage caused by defective workmanship done by subcontractors." French at 122-23 (emphasis added); *see* Thomas E. Miller, et al., § 6.02 *Third Party Coverage, Handling Construction Defect Claims: Western States* 123 (2018) ("The majority of state supreme courts that have decided whether inadvertent faulty workmanship is an accidental 'occurrence' potentially covered under the CGL policy have ruled that it can be an 'occurrence.'") ("Miller"). According to Miller, 21 state supreme courts have adopted this position, with some of these courts reversing their own contrary precedent. Miller at § 6.02; *see, e.g.*, *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 417 (W. Va. 2013) (reversing court's precedent precluding faulty workmanship from constituting an "occurrence," finding it "outdated").

Before 2012, state supreme courts adopted "wildly" different approaches. *See* Miller at § 6.02. A minority of states—14, according to Miller—had determined that "defective workmanship (i.e., construction defects) do[es] not constitute an 'occurrence.'" *Id.* But at least one, New Jersey, has since migrated to the majority view

26

that faulty workmanship by a subcontractor can be an occurrence under CGL insurance policies. *See Cypress Point Condo. Ass'n v. Adria Towers, LLC*, 143 A.3d 273, 287 (N.J. 2016). Miller also notes that some of these state decisions finding no "occurrence" have been superseded by local statutes requiring CGL policies issued in those states to include coverage for defective workmanship. Miller at § 6.02; *see, e.g.*, *Essex Ins. v. Holder*, 261 S.W.3d 456, 460 (Ark. 2008) (holding that defective construction resulting in damage only to the insured's work product itself is foreseeable and thus not an "occurrence" under the CGL policy), *superseded by statute,* Ark. Code Ann. § 23-79-155(a)(2) (2011) (requiring CGL insurance policies to define "occurrence" to include "[p]roperty damage or bodily injury resulting from faulty workmanship").[16]

4. **New York Intermediate Appellate Court Decisions Do Not Preclude Coverage**

The Policy language and other state supreme court decisions support a finding of "occurrence." Would the New York Court of Appeals agree? We think it would, though

---

[16] The dissent criticizes the majority opinion for "'turning to the law of other jurisdictions' to determine what the New York Court of Appeals 'would probably' decide in this case." Dissent at 4 (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 389 (1976)) (brackets omitted). But *Lehman* does not preclude us from considering other jurisdictions in attempting to predict how the New York Court of Appeals would decide this case. Moreover, we are aware of no rule that would prevent the New York Court of Appeals from considering—as it has before and as we have here—"how CGL policies are generally drafted, scholarly sources, and persuasive authority from courts applying the law of other jurisdictions," *id.* at 4, to assist in determining an issue on which it has not ruled. *See, e.g.*, *Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 708 N.E.2d 167, 169 (N.Y. 1996) (discussing standard form CGL policy); *Cont'l Cas. Co. v. Rapid-American Corp.*, 609 N.E.2d 506, 508, 510-11 (N.Y. 1993) (same); *Davis v. S. Nassau Cmty. Hosp.*, 46 N.E.3d 614, 622 (N.Y. 2015) (relying on legal treatise); *Viking Pump*, 52 N.E.3d at 1152 (relying on law review articles); *People v. Leonard*, 970 N.E.2d 856, 860 (N.Y. 2012) (relying on supreme court decisions from other states); *In re D.*, 261 N.E.2d 627, 630 (N.Y. 1970) (same).

it has yet to address this question.  Where, as here, "jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent convincing evidence that the highest court would decide otherwise."  *Greystone*, 661 F.3d at 1282 (quotations omitted).  We therefore consider decisions of New York intermediate appellate courts interpreting standard-form CGL policies and conclude they do not preclude coverage under the Policy here.[17]

Aspen relies on decisions from New York's intermediate appellate courts, contending they preclude coverage for the damages at issue here.  But these cases (1) did not involve or failed to analyze the "subcontractor exception," (2) involved CGL policies that predated the critical revisions ISO made in 1986, (3) relied on cases that have since been overturned, (4) involved faulty work by a contractor rather than a subcontractor, or (5) contained some combination of the above.  These distinguishing factors provide ample "convincing evidence" that New York's Court of Appeals would decline to find no

---

[17] B&V suggests the Policy is different from the standard-form CGL policy, and thus New York cases interpreting the standard policy are inapplicable.  *See* Aplt. Br. at 10 (stating that the parties' negotiation resulted in a "manuscript policy," meaning that it "contains negotiated terms and is not a standard ISO form policy"); *see also id.* at 27. But as Aspen points out, B&V never explains how the Policy's language differs from the standard language.  *See* Aplee. Br. at 32; *see also Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, No. 12-2350-SAC, 2016 WL 6804894, at *8 (D. Kan. Nov. 17, 2016) ("The parties do not argue that [the 'occurrence'] definition is unusual or atypical for a CGL policy.").  We find that the Policy's language is materially the same as the language found in ISO's standard-form CGL policies.  We nevertheless agree with B&V that New York case law does not foreclose coverage.

28

"occurrence" under the Policy here. *See id.* The remainder of this section discusses—

and distinguishes—the cases on which Aspen relies.[18]

a. *George A. Fuller Co. v. U.S. Fiduciary & Guaranty Co.*

Aspen relies heavily on *Fuller* for the proposition that CGL insurance policies are

"not intended to insure against faulty workmanship or construction" and thus cannot

cover the damages at issue here. *See* Aplee. Br. at 21. But *Fuller* is inapplicable here,

and it relied on cases that involved CGL policies drafted before ISO's 1986 changes.

*Fuller* involved a coverage dispute over damages to a building that a developer

had hired a contractor to build. 613 N.Y.S.2d at 154. Due to a subcontractor's faulty

workmanship, the building suffered water damage. *Id.* The contractor's CGL insurance

carrier refused to pay the claim, and the contractor sued. *Id.* The question was whether

the contractor's faulty workmanship constituted an "occurrence," which was defined

under the policy as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions." *Id*. at 153. The court determined the

damages were not an "occurrence" because they were not accidental but rather had been

---

[18] The dissent refers to New York intermediate appellate court decisions carrying "precedential weight," Dissent at 3, which they do in appropriate circumstances. But a court decision does not necessarily carry precedential weight when it is materially distinguishable from the case at hand. As we have shown, the New York cases that Aspen relies on, starting with *Fuller*, contain no discussion of CGL policies that contain a "subcontractor exception." Moreover, as the New York Court of Appeals has said, Appellate Division decisions "are certainly not binding upon this court." *People v. Roche*, 379 N.E.2d 208, 216 (N.Y. 1978). Nor are we required to follow such decisions when "other authority convinces us that the state supreme court would decide otherwise." *Daitom, Inc.*, *v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984); *see also Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967).

caused by "intentional cost-saving" acts. *Id*. at 155. *Fuller* is inapposite here for four reasons.

First, *Fuller* does not address the issue here—whether damages caused by a subcontractor are covered by a CGL policy that expressly provides coverage for damages to an insured's work arising from a subcontractor's faulty workmanship. The policy in *Fuller* excluded damages to "that particular part of any property that must be restored, repaired or replaced" due to work that was performed incorrectly either by "you [the insured] or on your behalf [by a subcontractor]." *Id.* at 153. The court thus concluded that the CGL policy in that case did not intend to cover damages to an insured's own work, regardless of whether the contractor or its subcontractor caused the damages. The dissent reads *Fuller* to mean that *any* CGL policy employing the standard definition of "occurrence" necessarily excludes subcontractor-caused damages to an insured's own work. *See* Dissent at 1. But this is overly broad. *Fuller* says only that *the particular policy in that case* "d[id] not insure against faulty workmanship in the work product itself." *Fuller*, 613 N.Y.S.2d at 155. The dissent takes this single passage out of context and concludes that New York intermediate appellate courts have held that the damages at issue here can never be an occurrence, *see* Dissent at 2, ignoring this critical distinction between the two cases.[19]

---

[19] The dissent also reads too much into this opinion's discussion of *Fuller* when it says "the majority concludes the *Fuller* rule only applies where the CGL policy does not include a Subcontractor Exception, even though no New York court has limited the rule in this way." Dissent at 3. Our holding is not so prescriptive. We conclude only that *Fuller* does not preclude the damages at issue here from constituting a coverage-triggering "occurrence" under the Policy.

Second, *Fuller* relied on two cases from New York's intermediate appellate courts to support its statement that CGL policies are not intended to cover damages to the insured's own defective work product—*Village of Newark v. Pepco Contractors, Inc.*, 472 N.Y.S.2d 66 (N.Y. App. Div. 1984), *aff'd*, 465 N.E.2d 1261 (N.Y. 1984), and *Parkset Plumbing & Heating Corp. v. Reliance Ins. Co.*, 448 N.Y.S.2d 739 (N.Y. App. Div. 1982). But both of these cases were decided before 1986, when the ISO clarified that standard-form CGL policies covered insureds for property damage to—or caused by—subcontractors' work.

Third, *Fuller*'s primary rationale for finding no "occurrence" is absent here. *Fuller* held that the damages at issue were not accidental but rather resulted from intentional cost-cutting measures and thus could not constitute an "occurrence." Here, Aspen does not argue—nor does the record suggest—that the damage to the JBRs arose from any intentional or negligent acts by B&V or MTI.

Fourth, Aspen cites *Fuller* to argue that B&V's interpretation would transform the Policy into a surety for the performance of B&V's work. Aplee. Br. at 21; *see Fuller*, 613 N.Y.S.2d at 155 (holding that the CGL policy was not "intended to insure [the general contractor's] work product"). But allowing CGL policies to cover damage from subcontractor-caused construction defects would not convert insurance policies into surety performance bonds. *See* French at 139-40; *see also Greystone*, 661 F.3d at 1288-89. Both insurance policies and performance bonds are used to spread risk, but they differ in fundamental ways. An insurance policy spreads the contractor's risk. A performance bond guarantees completion of the contract upon the contractor's default.

31

*See* French at 139-40 ("Performance bonds protect the property owner, while liability insurance protects the contractor."). The "principal purpose[]" of insurance is to transfer financial responsibility from the policyholder to an insurer for damage caused by the policyholder's negligence. *Id.* at 140. Allowing CGL policies to cover construction defects caused by a subcontractor comports with the purpose of liability insurance—to protect the contractor, not the property owner.

b. *Other New York cases*

Aspen also cites *Baker Residential Limited Partnership v. Travelers Insurance Co.*, 782 N.Y.S.2d 249, 250 (N.Y. App. Div. 2004), for the proposition that an "occurrence" happens under CGL policies only when damage to property is "distinct from the plaintiffs' own work product." *See* Aplee. Br. at 23. The *Baker* opinion, which consists of two paragraphs, cites only two cases. The first, *Fuller*, is inapt for the reasons explained above. The second, *Pavarini Construction Co. v. Continental Insurance Co.*, relies solely on *Fuller*. *See* 759 N.Y.S.2d 56, 57-58 (N.Y. App. Div. 2003). Neither of these opinions provides any discussion or guidance on interpreting policies with a "subcontractor exception."

Aspen next cites *Ohio Casualty Insurance Co. v. Lewis & Clinch, Inc.*, No. 7:12-CV-1872, 2014 WL 6078572, at *9 (N.D.N.Y Nov. 13, 2014), for the same proposition—that damage to the insured's own work is not a covered "occurrence" under CGL policies. Once again, however, *Ohio Casualty* relied entirely on the inapposite language in *Fuller*. *See id. Ohio Casualty* is also an unpublished case from a federal

32

district court rather than a New York state court.  Further, it did not involve a subcontractor's faulty workmanship.

Finally, Aspen provides a three-page string cite of cases from New York's intermediate appellate courts and federal district courts, but these cases are unavailing for largely the same reasons addressed above.  Every one of the 15 cases relied on *Fuller*. *See, e.g.*, *Eurotech Constr. Corp. v. QBE Ins. Corp.*, 26 N.Y.S.3d 703, 703 (N.Y. App. Div. 2016); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Turner Constr. Co.,* 986 N.Y.S.2d 74, 77 (N.Y. App. Div. 2014) ("*National Union*"); *Maxum Indem. Co. v. A One Testing Labs., Inc.*, 150 F. Supp. 3d 278, 284 (S.D.N.Y. 2015).  One of the cases, *Exeter Building Corp. v. Scottsdale Insurance Co.*, 913 N.Y.S.2d 733, 735 (N.Y. App. Div. 2010), did not cite to *Fuller* directly but rather cited to *Baker*, which in turn relied on *Fuller*.

Another of Aspen's aforementioned cases, *National Union*, relied heavily on what used to be the seminal case regarding the issue of whether CGL policies cover construction defects—the New Jersey Supreme Court's opinion in *Weedo v. Stone-E-Brick, Inc*, 405 A.2d 788 (N.J. 1979).  *See National Union*, 986 N.Y.S.2d at 77; *see also* French at 117.  But *Weedo* has been overturned.  *Weedo* held that CGL policies "do not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident."  405 A.2d at 796.  The New Jersey Supreme Court "effectively overruled" *Weedo* in *Cypress Point*, holding that damages caused by the subcontractor's faulty workmanship *can* constitute property damage under CGL policies.  *See* French at 119

33

("For numerous reasons, the *Weedo* decision is obsolete and of little value today in analyzing whether construction defects can constitute occurrences.").[20]

\* \* \*

In sum, we conclude that New York intermediate appellate court decisions would not persuade the New York Court of Appeals to find that the damages at issue here were not an "occurrence"—particularly in the face of the other reasons discussed above. The dissent submits that if there is "any debate regarding the clarity of New York Law, we should certify the question." Dissent at 5 n.6. In *Lehman*, the Supreme Court said that when a federal court faces a novel state law question in an area where state law is highly unsettled, it *may* be appropriate to certify the question to the state's highest court. 416

---

[20] In *Revisiting Construction Defects*, French further explains why *Weedo* is obsolete:

> One, the [*Weedo*] court did not analyze the definition of "occurrence" in the policy at issue and did not even address whether the faulty stucco work constituted an occurrence.

> Two, the court did not analyze the definition of "property damage" in the policy at issue and did not address whether the faulty stucco work was property damage or caused property damage.

> Three, [a 1971 law review article] on which the court relied, did not analyze or address the issues of whether construction defects constitute occurrences or property damage. Instead, [the] article focused on the business risk exclusions contained in the 1966 CGL policy form, and [] then offered . . . unsupported conclusions regarding the intent of the exclusions.

> Four, . . . the business risk exclusions at issue in the case were redrafted in 1986 to provide much narrower reductions in coverage than the earlier versions of such exclusions.

French at 119 (paragraph breaks added) (citations omitted).

34

U.S. at 390-91 ("We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory.") As noted in *Lehman*, whether to certify a question "rests in the sound discretion of the federal court." *Id.* at 391. We have declined to do so here.

5. **Second Circuit Case Law is Distinguishable**

Aspen also relies on a Second Circuit decision, *J.Z.G. Resources, Inc. v. King*, 987 F.2d 98 (2d Cir. 1993), which applied New York law to a construction dispute. *See* Aplee. Br. at 22. In *J.Z.G.*, a real estate developer sued a contractor for building roads at the wrong elevation and location. 987 F.2d at 100. The contractor sought coverage for damage to the roads themselves. *Id.* The Second Circuit held the contractor's CGL policy did not encompass the road damage, explaining that "this circuit has held that a CGL policy did not provide coverage for a claim against an insured for the repair of faulty workmanship that damaged only the resulting work product." *Id.* at 102-03.

*J.Z.G.* is not persuasive here. First, it did not involve faulty subcontractor work. Second, it relied on cases and commentary either predating or failing to take into account ISO's 1986 changes.[21] In particular, it relied on the following passage from a 1971 law review article: "The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the

---

[21] As explained above, in 1986, ISO revised the standard CGL insurance policy to clarify—in ISO's words—that the policy "cover[ed] . . . damage to, or caused by, a subcontractor's work after the insured's operations are completed." ISO 1986 Circular.

insured may be found liable." *Id*. (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations-What Every Lawyer Should Know,* 50 Neb. L. Rev. 415, 441 (1971)).

But this article analyzed the business risk exclusion contained in the ISO's 1966 standard-form CGL policy, which *precluded* coverage for damage to construction projects caused by subcontractors. *See* French at 107, 118. By 1986, the ISO had acceded to contractors' demands to provide coverage for faulty subcontractor work and replaced that exclusion with the current language. Commentators have noted that this article is outdated and "of little value today in understanding . . . whether construction defects can constitute occurrences." *Id.* at 119. "Following [ISO's] 1986 changes . . . , one would expect that . . . [the] 1971 law review article would be cited by courts only as a historical note regarding the evolution of the policy language and law in this arena." *Id.* "Surprisingly, however, . . . [the] article continue[s] to be relied upon by some courts from time to time, particularly in decisions where the court misinterprets the issue before it." *Id*. The analysis underlying *J.Z.G.* is therefore outdated and of no use here.

### III. **CONCLUSION**

Under the Policy, the damages at issue here were caused by a coverage-triggering "occurrence." First, the damages were accidental and resulted in harm to a third-party's property, thus meeting the Policy's definition of an "occurrence." Second, the district court's interpretation would violate New York's rule against surplusage by rendering the "subcontractor exception" meaningless. Third, the changes ISO has made to standard-form CGL policies demonstrate that the policies can cover the damages at issue here.

Fourth, the overwhelming trend among state supreme courts has been to recognize such damages as "occurrences." Fifth, New York intermediate appellate decisions are distinguishable, outdated, or otherwise inapplicable. We predict the New York Court of Appeals would decline to follow these decisions and instead would join the clear trend among state supreme courts holding that damage from faulty subcontractor work constitutes an "occurrence" under the Policy. For the foregoing reasons, we vacate the district court's summary judgment decision and remand for reconsideration in light of this opinion. [22]

---

[22] We grant Appellees' August 4, 2017 motion for leave to file additional authority.

No. 16-3359, <u>Black & Veatch Corporation v. Aspen Insurance, et al.</u>
**BRISCOE**, Circuit Judge, dissenting.

**I**

I respectfully dissent because I believe New York law forecloses insurance coverage for damage to the work product of an insured, which is precisely the type of damage at issue here. Therefore, because I agree with the district court's conclusion that "New York law's governing definition of 'occurrence' does not recognize liability coverage" in this instance, D. Ct. Order at 56, I would affirm the district court.

The rule among intermediate appellate courts in New York has been that a CGL policy that includes a standard definition of "occurrence":

> does not insure against faulty workmanship in the work product itself but rather faulty workmanship in the work product which creates a legal liability by causing bodily injury or property damage to something other than the work product.

<u>George A. Fuller Co. v. U.S. Fid. & Guar. Co.</u>, 613 N.Y.S.2d 152, 155 (N.Y. App. Div. 1st Dep't. 1994).[1]

In recent years, New York courts have applied this rule to hold that the insured can only recover when the "damage caused by faulty workmanship [is] to something other than [to] the work product." <u>I.J. White Corp. v. Columbia Cas. Co.</u>, 964 N.Y.S.2d 21, 23 (N.Y. App. Div. 1st Dep't. 2013) (coverage applied because the damage was to cakes, not the freezer that the insured built). Further, intermediate state appellate decisions have

---

[1] <u>See</u> <u>also</u> <u>Eurotech Constr. Corp. v. QBE Ins. Corp.</u>, 26 N.Y.S.3d 703 (N.Y. App. Div. 1st Dep't. 2016); <u>Bonded Concrete, Inc. v. Transcon. Ins. Co.</u>, 784 N.Y.S.2d 212, 213 (N.Y. App. Div. 3d Dep't. 2004); <u>Baker Residential Ltd. P'ship v. Travelers Ins. Co.</u>, 782 N.Y.S.2d 249, 250 (N.Y. App. Div. 3d Dep't. 2004).

held that even when a subcontractor caused the damage, an insured general contractor cannot be covered for damage to its own work product because it is "responsible for the entire project[,] and all work done by [any] subcontractor was done on" behalf of the general contractor. Pavarini Constr. Co. v. Cont'l Ins. Co., 759 N.Y.S. 2d 56, 57 (N.Y. App. Div. 1st Dep't. 2003); see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turner Constr. Co., 986 N.Y.S.2d 74, 77 (N.Y. App. Div. 1st Dep't. 2014).

New York intermediate appellate courts have therefore developed a rule that a CGL policy using the standard definition of "occurrence" cannot cover damage to the insured's own work product, even when errors by the insured or its subcontractors cause the damage. Applying that rule to this case, there was no "occurrence"—which would trigger coverage—because the damage was to the jet bubbling reactors, which were B&V's own work. Because B&V has not satisfied its "initial burden of proving that the damage was the result of an 'accident' or 'occurrence,'" we need not proceed to examine whether an exclusion and an exception to that exclusion apply. Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 774 N.E.2d 687, 692 (N.Y. 2002).

Given this analysis, I would affirm the district court.

## II

The majority, however, reverses the district court. In doing so, the majority concludes there is an insured "occurrence" in this case, in part because it does not apply the New York cases. It instead determines that the rule applied in Fuller, Pavarini, I.J. White and other New York appellate cases is "outdated" and inapplicable to this case because the rule's logic preceded the Insurance Services Office, Inc.'s 1986 revisions to

2

the standard CGL policies, Op. at 37, making the cases "materially distinguishable." Id. at 29 n.19. In other words, the majority concludes the Fuller rule only applies where the CGL policy does not include a Subcontractor Exception, even though no New York court has limited the rule in this way. See D. Ct. Order at 31 (concluding there is no indication in New York law that a Subcontractor Exception would alter New York law, and noting that an unpublished federal district court case involving a Subcontractor Exception "does not reflect any argument or discussion of this exception as having the effect of modifying New York's law") (citing Ohio Cas. Ins. Co. v. Lewis & Clinch, Inc., No. 7:12-CV-1872 (GTS/TWD), 2014 WL 6078572 (N.D.N.Y. Nov. 13, 2014)).[2]

I conclude, however, that in declining to apply the rule that New York's intermediate appellate courts have applied we exceed our proper role as a court of review in a diversity action. Our role is to determine how the New York Court of Appeals would decide this case. To accomplish this task, we must apply relevant New York case law. If the New York courts have held that damage to the insured's own work product is not an "occurrence," even if the damage results from a subcontractor's error, it is not our role to tell the New York courts that their rulings do not carry any precedential weight or are limited to their facts.

---

[2] See also Thruway Produce, Inc. v. Mass. Bay Ins. Co., 114 F. Supp. 3d 81, 97 (W.D.N.Y. 2015) (denying coverage, despite a Subcontractor Exception); Aquatectonics, Inc. v. Hartford Cas. Ins. Co., No. 10-CV-2935 (DRH) (ARL), 2012 WL 1020313, at *8 (E.D.N.Y. Mar. 26, 2012) (relying on Fuller to deny coverage, despite a Subcontractor Exception).

Instead, in the circumstances presented here, where "there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent convincing evidence that the highest court would decide otherwise." United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 957 (10th Cir. 2011) (quotation omitted). The majority, however, believes we *do* have convincing evidence that the New York Court of Appeals would not apply the Fuller rule to a CGL policy with a Subcontractor Exception. The majority reviews extrinsic evidence about how CGL policies are generally drafted, scholarly sources, and persuasive authority from courts applying the law of other jurisdictions. Armed with these authorities, the majority "predict[s] the New York Court of Appeals would decline to follow [the Fuller rule] and instead would join the clear trend among state supreme courts holding that damage from faulty subcontractor work constitutes an 'occurrence.'" Op. at 37.

This is a bridge too far. In reaching its conclusion, the majority takes the sort of step the Supreme Court has criticized by "turn[ing] to the law of other jurisdictions" to determine what the New York Court of Appeals "would probably" decide in this case. Lehman Bros. v. Schein, 416 U.S. 386, 389 (1974). This might be acceptable if existing New York law were "difficult or uncertain." Colony Ins. Co. v. Burke, 698 F.3d 1222, 1235 (10th Cir. 2012) (quotation omitted). But that is not the case here. It is not difficult to ascertain how New York courts would decide the issues presented here—nor does the majority say it would be difficult. The majority merely attempts to distinguish New York case law, and then describes New York law as if "this case apparently raises an issue of

4

first impression." <u>Walker v. BuildDirect.com Techs., Inc.</u>, 733 F.3d 1001, 1005 (10th Cir. 2013).[3]

Even assuming, *arguendo*, that we could legitimately distinguish <u>Fuller</u> and its progeny, meaning there are "no controlling precedents," <u>Elkins v. Moreno</u>, 435 U.S. 647, 662 (1978),[4] and "a state court has not yet had the opportunity to interpret the pertinent" question, <u>Kansas Judicial Review v. Stout</u>, 519 F.3d 1107, 1119 (10th Cir. 2008) (quotation omitted),[5] I do not believe we should exercise our discretion to decide how the New York Court of Appeals would rule.[6] Rather, if there are truly no New York cases to guide us, certifying the question to the New York Court of Appeals acknowledges that "[w]hen federal judges [outside New York] attempt to predict uncertain [New York] law, they act . . . as 'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction." <u>Lehman Bros.</u>, 416 U.S. at 391. In other words, I do not believe federal courts should predict what a state court will likely do, without any state

---

[3] <u>Certified question answered</u>, 349 P.3d 549 (Okla. 2015).

[4] <u>Certified question answered sub. Nom.</u>, <u>Toll v. Moreno</u>, 397 A.2d 1009 (Md. 1979).

[5] <u>Certified question answered</u>, 196 P.3d 1162 (Kan. 2008), <u>opinion after certified question answered</u>, 562 F.3d 1240 (10th Cir. 2009).

[6] The majority is correct that, as an initial matter, we are tasked with discerning what the New York Court of Appeals would decide if this case came before it. Op. at 9 n.7 (citing <u>Bird v. W. Valley City</u>, 832 F.3d 1188, 1199 (10th Cir. 2016)). Yet, if—hypothetically—a review of New York cases does not indicate what the New York Court of Appeals would likely decide, it is not our place to guess about the result. Though the majority portrays this dissent as treating the two forms of analysis interchangeably, <u>see id.</u>, I emphasize that I believe we can discern how the New York Court of Appeals would rule based on existing New York case law. But if there is any debate regarding the clarity of New York law, we should certify the question.

5

guidance, because "a State can make just the opposite [determination of what the federal court predicts] her law" to be.  Id. at 389.[7]

Therefore, even if New York law were distinguishable—which, as stated above, I do not believe it is—I would not reverse the district court, but would certify the question to the New York Court of Appeals.

---

[7] The parties have not moved to certify, but it is within our authority to certify *sua sponte*.  See State Farm Mut. Auto. Ins. Co. v. Fisher, 609 F.3d 1051, 1058 (10th Cir. 2010).